UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BUZZBALLZ, LLC,<br>Plaintiff,<br>v.<br>MPL BRANDS NV, INC.,<br>Defendant. | Case No. 24-cv-04004-EKL<br><br>**ORDER GRANTING BUZZBALLZ'S MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 241 |

Plaintiff BuzzBallz, LLC ("BuzzBallz") and Defendant MPL Brands NV, Inc. d/b/a Patco Brands ("Patco") are rival producers of ready-to-drink cocktails. This litigation started when BuzzBallz sued Patco for intellectual property infringement and unfair competition. *See* Compl., ECF No. 1. BuzzBallz claimed that Patco designed and markets its Big Sipz line of cocktails to confuse consumers and trade on BuzzBallz's reputation and goodwill. In response, Patco asserted a variety of counterclaims, some of which have been dismissed. *BuzzBallz, LLC v. MPL Brands NV, Inc.*, 826 F. Supp. 3d 1093 (N.D. Cal. 2025). Now, BuzzBallz moves for summary judgment on Patco's remaining counterclaims for cybersquatting and unfair competition. Mot. for Summ. J., ECF No. 321-3. The Court carefully reviewed the entire record and heard argument on May 20, 2026. For the following reasons, BuzzBallz's motion for summary judgment is GRANTED.

## I. LEGAL STANDARD

A court may grant summary judgment on any issue if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

United States District Court
Northern District of California

United States District Court
Northern District of California

The moving party bears the initial burden of demonstrating that there is no genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may satisfy this burden in different ways depending on whether it has the burden of proof at trial. If the moving party bears the burden of proof at trial, it must cite to "particular parts of materials in the record" to demonstrate that no reasonable trier of fact could find for the non-moving party. Fed. R. Civ. P. 56(c)(1)(A). By contrast, if the non-moving party bears the burden of proof at trial, the moving party need only demonstrate that there is an absence of evidence to support the non-moving party's case. *Celotex*, 477 U.S. at 325; *see also* Fed. R. Civ. P. 56(c)(1)(B).

Once the moving party has met its burden, the burden shifts to the non-moving party to designate specific facts showing that there is a genuine dispute. *Celotex*, 477 U.S. at 324. To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient" to survive summary judgment. *Anderson*, 477 U.S. at 252. Instead, "there must be evidence on which the jury could reasonably find for the [non-moving party]." *Id.*

In determining whether there is a genuine dispute of material fact, the court must take "the evidence and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party." *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011). The court does not "engage in credibility determinations or weigh evidence." *Munden v. Stewart Tit. Guar. Co.*, 8 F.4th 1040, 1044 (9th Cir. 2021). At summary judgment, the focus is not "on the admissibility of the evidence's form," but rather "on the admissibility of its contents." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003). "To survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rule[] of Civil Procedure 56." *Block v. City of Los Angeles*, 253 F.3d 410, 418-19 (9th Cir. 2001). An affidavit or declaration "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

## II. PATCO'S COUNTERCLAIMS

Patco's remaining counterclaims assert that BuzzBallz engaged in cybersquatting in violation of the Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d), and that BuzzBallz violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200. The UCL counterclaim is premised on three categories of conduct: (1) cybersquatting; (2) BuzzBallz's patent prosecution and other litigation conduct; and (3) BuzzBallz's attempts to restrict Patco from accessing distributors and retailers. The Court addresses each counterclaim and the relevant undisputed facts in turn.

### A. Cybersquatting

#### 1. Undisputed Facts

In support of its cybersquatting counterclaim, Patco asserts that BuzzBallz registered or acquired two website domain names that are similar to Patco's "Big Sipz" trademark to confuse Patco's potential customers. At the time of the alleged cybersquatting, Patco had not begun selling Big Sipz cocktails, and it had not secured registration of the Big Sipz mark. "Under the Lanham Act, the ability to secure registration for a trademark typically depends, as trademark rights generally do, upon actual use of the mark in commerce." *Lodestar Anstalt v. Bacardi & Co. Ltd.*, 31 F.4th 1228, 1237 (Fed. Cir. 2022). However, the Lanham Act also allows an applicant to seek registration of a trademark based on a "bona fide intention to use the mark in commerce." 15 U.S.C. § 1051(b). An intent-to-use application cannot be granted "unless and until the applicant subsequently files a 'verified statement that the mark is in use in commerce.'" *Lodestar Anstalt*, 31 F.4th at 1237 (quoting 15 U.S.C. § 1051(d)(1)). The benefit of filing an intent-to-use application is that, if the registration is ultimately granted, the date of the application becomes the applicant's "constructive-use date," which gives the applicant priority of use over anyone who adopts the mark after that date. *Id.*

In this case, Patco filed an intent-to-use application for the Big Sipz mark on December 20, 2021. Add. Fact No. 1.[1] Three days after the application was filed, an unknown party registered

---

[1] This Order relies exclusively on undisputed facts. *See* Reply Separate Statement, ECF No. 322-81. Citations to "Fact No." reference the undisputed facts proffered by BuzzBallz, and citations to



United States District Court
Northern District of California

the domain name bigsipz.com. Fact No. 17; Add. Fact No. 5. On April 12, 2022, BuzzBallz purchased bigsipz.com and redirected its web traffic to BuzzBallz's website. Fact Nos. 6, 18; Add. Fact No. 2; Patco Ex. 9, ECF No. 322-10. Around the same time, BuzzBallz registered a separate domain name – bigsipzcocktails.com – and also redirected its web traffic to BuzzBallz's website. Fact No. 5, Add. Fact No. 2.

On April 29, 2022, Patco contacted BuzzBallz about the bigsipzcocktails.com and bigsipz.com domain names. Fact No. 7. This outreach is reflected in the text message exchange below:




BuzzBallz Ex. D-4, ECF No. 321-8; *see also* Patco Exs. 30-35, ECF Nos. 271-32 through -37.

At her deposition, BuzzBallz's founder and former chief executive officer Merrilee Kick explained the decision to acquire and register the domain names:

> I thought, you know, they're coming after us. Let's mess with them a little bit. And I said, I wonder if they took the time to get their domain names. And we started looking, and it looked like nobody had bought the domain name. So I thought, let's mess with them a little bit.
>
> . . . .

---

"Add. Fact No." reference the undisputed facts proffered by Patco. To the extent a party objects to evidence, but concedes that the facts are undisputed, the objections are not material.

> And it was during a cocktail party when they finally discovered that they didn't reserve their own domain name, and I thought, well, that's because they're stupid. And so, you know, we'll just play a little joke on them, and then when my guy, head of sales, came to me and he got a call from his buddy at Big Sipz saying, what the heck, you took our domain name . . . . I said, tell them I'll sell it back to them for a million dollars, as a joke.
>
> . . . .
>
> To me, it was a joke. Kind of like, let's see if they're really prepared for this. . . . And we gave [the domain names] back to them, too, by the way.

Patco Ex. 3, Kick Dep. Tr. 61:13-19, 63:4-15, 63:22-23, ECF No. 322-4. Indeed, "all joking and kidding aside," BuzzBallz transferred both domain names to Patco free of charge in May 2022 – less than two months after acquiring them, and within weeks of Patco's outreach. Fact Nos. 2, 9; *see also* BuzzBallz Ex. D-4. The bigsipz.com website first went "live" in December 2022, about seven months after BuzzBallz transferred the domain name to Patco. Fact No. 14; BuzzBallz Ex. H, ECF No. 321-13. Patco never used the bigsipzcocktails.com domain name for any purpose. BuzzBallz Ex. D, Stanley Dep. Tr. 180:23-181:1, ECF No. 321-5.

Patco informed the U.S. Patent and Trademark Office ("USPTO") that it first used the Big Sipz mark in commerce "at least as early as" October 1, 2022, but did not provide any evidence of earlier use. Fact No. 12. The USPTO issued an official notice of registration of the Big Sipz mark on March 21, 2023. Patco Ex. 1, ECF No. 271-3.

**2. Discussion**

To prevail on a claim under the ACPA,[2] Patco must show that "(1) [BuzzBallz] registered, trafficked in, or used a domain name; (2) the domain name is identical or confusingly similar to a protected mark owned by [Patco]; and (3) [BuzzBallz] acted 'with bad faith intent to profit from that mark.'" *DSPT Int'l., Inc. v. Nahum*, 624 F.3d 1213, 1218-19 (9th Cir. 2010) (quoting 15 U.S.C. § 1125(d)(1)(A)(i)). The mark must be "distinctive at the time of registration of the domain name." 15 U.S.C. § 1125(d)(1)(A)(ii). In general terms, a mark is distinctive if it identifies the source of a product. *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210-11 (2000).

---

[2] BuzzBallz argues that Patco lacks a redressable injury, but Patco could pursue statutory damages if it demonstrated a genuine dispute of fact as to liability. 15 U.S.C. § 1117(d).

Here, no reasonable jury could find that Patco's Big Sipz mark was distinctive when the domain names were registered, or at any time BuzzBallz owned them. Patco advances two theories of distinctiveness. The first is legally deficient; the second fails for lack of evidence.

Patco's first theory is that, because the USPTO ultimately registered Patco's Big Sipz trademark, the mark was presumptively distinctive when the intent-to-use application was filed on December 20, 2021. Patco argues that, because the filing date of the intent-to-use application establishes that Patco *owned* the mark as of December 20, 2021, and because the USPTO did not require Patco to prove that its mark had acquired distinctiveness, the mark was also presumptively *distinctive* as of that date. Patco relies on *Zobmondo Entertainment, LLC v. Falls Media, LLC*, for the general proposition that a trademark is presumed to be distinctive if it is "registered without proof of secondary meaning." 602 F.3d 1108, 1115 (9th Cir. 2010).

Patco has not cited any case holding that the presumption of distinctiveness is *retroactively effective* back to the filing date of the intent-to-use application. This is not surprising, because the argument is inconsistent with the plain text of the ACPA. The ACPA provides that the mark must be distinctive "at the time of registration of the domain name." 15 U.S.C. § 1125(d)(1)(A)(ii). Although the USPTO's decision to register a mark creates a presumption that the mark is distinctive, that presumption does not attach *until* the USPTO makes the registration decision. To adopt Patco's position, the Court would need to accept that a mark may be deemed constructively distinctive before the related product or service exists. But that premise is nonsensical, because a mark must identify the source of a product in order to be distinctive in the first place. *See Wal-Mart Stores, Inc.* 529 U.S. at 210-11. Patco argues that, if its position is rejected, "trademark trolls" could monitor intent-to-use applications and register domain names without liability. Hr'g Tr. 64:2-65:8, ECF No. 316. But this policy concern does not change the plain text of the ACPA, and trademark applicants can avoid this situation by registering a domain name *before* filing an intent-to-use application. Accordingly, the Court finds no legal support for Patco's first theory that the March 21, 2023 registration of the Big Sipz mark renders the mark distinctive as of December 20, 2021 – the date of the intent-to-use application and before the domain names were registered.



United States District Court
Northern District of California

Because Patco's first theory is legally untenable, it must establish distinctiveness by showing that the Big Sipz mark had gained significance with the purchasing public through use in commerce by no later than April 2022, when the second domain name was registered. This theory lacks factual support. Patco submitted one presentation dated February 23, 2022, as evidence of its marketing of Big Sipz to distributors and wholesalers. *See* Patco Ex. 29, ECF No. 269-25. But there is no evidence that Patco actually made this presentation to distributors or wholesalers in February 2022, or if so, that the presentation was sufficient to establish the mark's distinctiveness. Indeed, the other undisputed facts and evidence in the record defeat that conclusion. For example, Patco did not incur trade spend, brand spend, or advertising and promotion expenses related to the Big Sipz products until September 2022. Fact No. 11; *see also* BuzzBallz Ex. F, Rohlich Dep. Tr. 158:13-159:2, ECF No. 321-9. Patco did not receive a purchase order from a distributor for Big Sipz products until November 2022. Fact No. 13. Thus, the first sales of Big Sipz to the public did not occur until at least six months after BuzzBallz registered or acquired the domain names. *See* Fact No. 13; BuzzBallz Ex. G, Elsberg Dep. Tr. 27:6-28:23, ECF No. 321-10 ("[Q.] . . . And if the first purchase order was November of 2022, the first sales to the public would have been after that date? A. Correct."). Because the undisputed facts demonstrate that Big Sipz were not sold – and Patco's marketing efforts were non-existent or *de minimis* – until later in 2022, no reasonable jury could conclude that the Big Sipz mark had acquired distinctiveness at the time the domain names were registered or used by BuzzBallz.

In sum, Patco has failed to raise a genuine dispute of material fact that its mark was distinctive at the time of the alleged cybersquatting, and BuzzBallz is entitled to summary judgment on that basis. Because this issue is dispositive, the Court does not resolve BuzzBallz's other arguments for summary judgment on this counterclaim.

### B. Unfair Competition Law

California's Unfair Competition Law ("UCL") prohibits "unlawful," "fraudulent," and "unfair" business acts and practices. Cal. Bus. & Prof. Code § 17200. Conduct is "unlawful" if it violates another law. *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999) (explaining that the UCL unlawful prong borrows violations from other laws).

Conduct is fraudulent if "members of the public are likely to be deceived." *Sybersound Recs., Inc. v. UAV Corp.*, 517 F.3d 1137, 1152 (9th Cir. 2008). Finally, in litigation between competitors, conduct is "unfair" if it "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech*, 20 Cal. 4th at 187. In devising this standard, the California Supreme Court was mindful that:

> An undefined standard of what is "unfair" fails to give businesses adequate guidelines as to what conduct may be challenged and thus enjoined and may sanction arbitrary or unpredictable decisions about what is fair or unfair. In some cases, it may even lead to the enjoining of *pro*competitive conduct and thereby undermine consumer protection, the primary purpose of the antitrust laws.

*Id.* at 185. Thus, although the UCL is more analytically flexible than the federal antitrust laws in some ways,[3] the focus is still on the actual or likely "effects" of conduct on competition as a whole. *Cel-Tech*, 20 Cal. 4th at 187. Consistent with this focus, the California Supreme Court recognized that "[i]njury to a competitor is not equivalent to injury to competition." *Id*. at 186.

Here, Patco's UCL counterclaim rests on several categories of conduct. First, Patco repurposes the same cybersquatting allegations discussed above. Second, Patco contends that BuzzBallz engaged in unlawful and unfair conduct related to its prosecution and procurement of a patent, as well as other litigation conduct. Finally, Patco contends that BuzzBallz attempted to restrict distributors and retailers from carrying Patco's Big Sipz products. As explained below, Patco has not raised a genuine dispute of material fact in support of any of these theories, and BuzzBallz is entitled to summary judgment on the UCL counterclaim.[4]

[3] For example, the UCL does not necessarily require a formal market definition, which is required under the Sherman Act. *See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1002 (9th Cir. 2023).

[4] For statutory standing, a UCL plaintiff must "(1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, *i.e.*, *economic injury*, and (2) show that that economic injury was the result of, i.e., *caused by*, the unfair business practice or false advertising that is the gravamen of the claim." *Kwikset Corp. v. Superior Ct.*, 51 Cal. 4th 310, 322 (2011); *see also* Cal. Bus. & Prof. Code § 17204. Patco has produced barely enough evidence of causal economic injury arising from cybersquatting and restrictions on Big Sipz distribution to establish standing under the UCL. *See* Patco's Resp. to Fact No. 4; Add. Fact No. 4.

**1. Cybersquatting**

Patco's evidence of cybersquatting fails to establish unlawful, fraudulent, or unfair conduct as a matter of law. First, as discussed above, BuzzBallz did not violate the ACPA, so its conduct was not unlawful under the UCL. *See Cel-Tech*, 20 Cal. 4th at 180. Second, there is no evidence that BuzzBallz's conduct was fraudulent. Patco did not identify any consumer that was confused by BuzzBallz's short-lived ownership of the domain names. *Sybersound Recs.*, 517 F.3d at 1152; BuzzBallz Ex. D, Stanley Dep. Tr. 181:18-182:3, ECF No. 321-5. Moreover, there is no likelihood that members of the public were deceived because Patco did not begin marketing the Big Sipz brand to the general public until after BuzzBallz transferred the domain names to Patco free of charge. *See* Rohlich Dep. Tr. 158:13-159:2 (testifying that Patco started marketing the Big Sipz brand to the general public in fall of 2022). Finally, there is no evidence that the short-term cybersquatting had any material effect on Patco's business, let alone an effect that significantly threatened competition or that amounts to an incipient violation of antitrust law. *See Cel-Tech*, 20 Cal. 4th at 187. At most, Patco produced evidence that its "employees spent valuable time investigating the Domain Names' ownership and developing contingency plans if Patco could not obtain" them. Add. Fact No. 4. Patco did not identify or quantify any loss of sales resulting from BuzzBallz's conduct; nor is there evidence that the conduct affected Patco's competitive standing or competition in general. *See* Stanley Dep. Tr. 179:7-22. Therefore, BuzzBallz's conduct was not unfair within the meaning of the UCL.

**2. The '904 Patent and Litigation Conduct**

Patco also nominally opposes summary judgment on the basis that BuzzBallz violated the UCL through "fraudulent procurement and assertion of [a patent], its coordination with competitors regarding litigation, and its sending cease and desist letters to Patco's business partners." Opp. at 19. However, *Noerr-Pennington* immunity precludes liability for this conduct. A summary of the Court's previous motion-to-dismiss ruling provides important context.

In addition to the cybersquatting and UCL counterclaims, Patco previously alleged two counterclaims for declaratory judgment of invalidity and inequitable conduct relating to BuzzBallz's prosecution of its U.S. Patent No. 11,738,904 ('904 Patent). *BuzzBallz*, 826 F. Supp.

3d at 1099. The ’904 Patent made a very brief appearance in this case. At the beginning of the litigation, BuzzBallz claimed that Patco infringed the ’904 Patent, but BuzzBallz voluntarily withdrew that claim on November 2, 2023 – less than two months after asserting it. *Id.* at 1098-99; Fact No. 24. BuzzBallz also executed a broad covenant not to sue Patco or its business partners for infringement of the ’904 Patent. *BuzzBallz*, 826 F. Supp. 3d at 1100-01; Fact No. 25. On July 22, 2025, the Court dismissed Patco’s declaratory judgment counterclaims without leave to amend. *BuzzBallz*, 826 F. Supp. 3d at 1100. Patco conceded that the invalidity counterclaim was moot due to the broad covenant not to sue, and the Court concluded that the inequitable conduct counterclaim was moot for the same reason. *Id*. at 1100-04.

Patco also previously asserted a counterclaim for attempted monopolization in violation of the Sherman Act, based in part on BuzzBallz’s brief assertion of the ’904 Patent. *Id*. at 1099, 1104-05. Patco alleged two theories of anticompetitive conduct to support this counterclaim:

> First, Patco claims that BuzzBallz engaged in “*Walker Process* fraud,” so named after the Supreme Court decision that recognized “the enforcement of a patent procured by fraud on the Patent Office may be violative of § 2 of the Sherman Act[.]” *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 174 (1965). Patco claims that BuzzBallz defrauded the Patent Office to obtain the ’904 Patent, then enforced the ’904 Patent through litigation. Counterclaim ¶¶ 139, 144. Second, Patco claims that BuzzBallz coordinated other litigation against Patco – unrelated to the ’904 Patent – and sent cease-and-desist letters to Patco’s business partners.

*BuzzBallz*, 826 F. Supp. 3d at 1104. The Court dismissed the attempted monopolization counterclaim because Patco: (1) failed to allege *any* geographic market; (2) alleged a “facially unsustainable” product market; (3) and failed to plausibly allege that BuzzBallz had a “dangerous probability of achieving monopoly power” in the relevant market. *Id*. at 1105-06. These are structural elements of a Sherman Act claim – *i.e.*, they supply necessary context about the structure of the market and the defendant’s position within that market – that a plaintiff must allege *in addition to* stating a viable theory of anticompetitive conduct. *See Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 455-56 (1993); *Walker Process*, 382 U.S. at 177.

Because the structural defects of the attempted monopolization claim were dispositive, the Court expressly did not “address whether Patco’s first theory based on *Walker Process* fraud [wa]s plausibly alleged.” *BuzzBallz*, 826 F. Supp. 3d at 1105 n.8. However, the Court did address

"Patco's second theory of anticompetitive conduct based on coordinated litigation and cease-and-desist letters" and held that, "[a]s currently alleged, this conduct is not actionable because it is shielded from liability under *Noerr-Pennington* immunity." *Id*. at 1105. The Court explained:

> Under the doctrine of *Noerr-Pennington* immunity, litigation activity is immune from antitrust liability unless it is "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." *Prof'l Real Est. Inv., Inc. v. Columbia Pictures, Inc.*, 508 U.S. 49, 60 (1993) ("*PRE*"). *Noerr-Pennington* immunity protects coordinated litigation activity, too. *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510-11 (1972); *see also Primetime 24 Joint Venture v. Nat'l Broadcasting Co.*, 219 F.3d 92, 99-100 (2d Cir. 2000) (recognizing that *Noerr-Pennington* immunity extends to "concerted litigation" and "concerted efforts incident to litigation" so long as such efforts are not objectively baseless). Here, Patco's allegations of "coordinate[d] litigation" cannot support a claim for attempted monopolization because Patco does not allege that the litigation was objectively baseless.
>
> The alleged cease-and-desist letters are also immune from antitrust liability. Sending cease-and-desist letters "is a common, if not universal, feature of modern litigation." *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 925, 936 (9th Cir. 2006) (affirming dismissal of claim premised on "tens of thousands of demand letters"); *see also Indus. Models, Inc. v. SNF, Inc.*, 716 F. App'x 949, 956 (Fed. Cir. 2017) (sending non-baseless cease-and-desist letters is "insufficient to support an antitrust claim"). Here, Patco alleges that BuzzBallz sent cease-and-desist letters to "Patco's manufacturing partners" mentioning that BuzzBallz has "multiple patents" and that Patco's products infringe "at least" one claim of Patent No. 11,932,441 ('441 Patent). Counterclaim ¶¶ 8, 18. But to be clear, Patco alleges only that the '904 Patent was procured by fraud, and the cease-and-desist letters *do not mention* that patent. Patco does not allege that the '441 Patent referenced in the cease-and-desist letters is invalid or that it was fraudulently obtained. And Patco does not otherwise allege that it was objectively baseless for BuzzBallz to claim that Patco's products infringe the '441 Patent. Thus, based on Patco's current allegations, BuzzBallz's cease-and-desist letters are protected by *Noerr-Pennington* immunity, and they cannot support a claim for attempted monopolization.

*BuzzBallz*, 826 F. Supp. 3d at 1107-08. Based on Patco's own allegations, the Court doubted that Patco could cure these pleading deficiencies.[5] Nonetheless, the Court granted leave to amend. *Id*.

---

[5] For example, Patco's counterclaims relied on an article explaining that the proposed ready-to-drink cocktail market was growing, and more brands were launching products. *BuzzBallz*, 826 F. Supp. 3d at 1106. This undermined Patco's assertion that competitors faced barriers to entry and expansion, such that BuzzBallz could potentially monopolize the market. *Id*. Discovery confirmed this reality. The parties' experts agree that the ready-to-drink category "as a whole saw substantial growth between 2020 and the present." Harper Report ¶ 320, ECF No. 321-74. Patco's expert described the category as "high-growth," explained that "many new brands and products entered the market," and noted that 349 new ready-to-drink products were launched



United States District Court
Northern District of California

at 1108. However, Patco chose not to reassert the attempted monopolization counterclaim when it filed its third amended counterclaims, and it never sought reconsideration of the Court's rulings. *See* Fact No. 36.

In light of this procedural history, Patco's arguments at this late stage are perplexing. First, Patco complains that, due to the Court's dismissal with leave to amend, Patco "was not able to pursue" discovery into whether BuzzBallz fraudulently procured and baselessly asserted the '904 Patent. Opp. at 19 n.5. This argument has no basis in the record. Although the Court dismissed the attempted monopolization counterclaim, the Court denied BuzzBallz's motion to dismiss the UCL counterclaim. If Patco planned to rely on conduct relating to the '904 Patent to support its UCL counterclaim, Patco could have sought discovery on that topic. Indeed, Patco cites no court order denying discovery into the '904 Patent due to the Court's motion to dismiss rulings. Even if BuzzBallz objected to such discovery, Patco could have sought relief from Magistrate Judge Illman and this Court, if necessary. *See* ECF Nos. 142, 169.[6]

Second, Patco "maintains that BuzzBallz's assertion of the '904 Patent is not shielded under the *Noerr-Pennington* doctrine because BuzzBallz made a sham allegation with the intent to harm a business competitor." Opp. at 19. But to overcome *Noerr-Pennington* immunity at summary judgment, Patco needed to produce evidence sufficient to create a genuine dispute of material fact to support the sham exception to *Noerr-Pennington* immunity. *Cf. White v. Lee*, 227 F.3d 1214, 1232 (9th Cir. 2000). Patco was required to produce evidence that: (1) BuzzBallz's assertion of the '904 Patent was "objectively baseless in the sense that no reasonable litigant could

---

between 2021 to 2023 – the same time period during which Big Sipz launched. *Id.* ¶ 46. These facts "do not describe a market guarded by barriers to entry or expansion, let alone a market that is dangerously close to becoming a monopoly." *BuzzBallz*, 826 F. Supp. 3d at 1106.

[6] Patco argues that the Court erred in dismissing the "*Walker Process* fraud claim," and contends that "this issue is preserved for appeal." Opp. at 19 n.5. Even if the Court's dismissal with leave to amend is preserved for appeal, it was strange and imprudent for Patco not to amend as the Court permitted. To plausibly allege and ultimately prove a *Walker Process* claim, Patco needed to establish not only "knowing and willful fraud on the Patent Office," but also "all other elements necessary to establish a Sherman Act" claim. *Chandler v. Phoenix Servs. LLC*, 1 F.4th 1013, 1014 (Fed. Cir. 2021) (citation modified). Patco's counterclaim fell far short of alleging several elements of a Sherman Act violation, and the Court did not err in reaching that conclusion. If Patco believed that it could save the *Walker Process* claim, it should have attempted to do so.

realistically expect success on the merits"; and (2) BuzzBallz's conduct was subjectively motivated by an intent to use the process of litigation, rather than its outcome, as an anticompetitive weapon. *PRE*, 508 U.S. at 60-61. Patco offers no evidence on either element of the sham exception. Instead, Patco merely cites to its opposition to BuzzBallz's motion to dismiss, which in turn cites to allegations in Patco's counterclaims. *See* Add. Fact No. 18; Patco's Resp. to Fact No. 37; *see also* Patco Opp. to Mot. to Dismiss at 8-12, 16-18, ECF No. 116 (citing Patco's Second Amended Counterclaims, ECF No. 106). These allegations do not create a genuine dispute of material fact.[7]

At summary judgment, Patco was required to "go beyond the pleadings," *Celotex*, 477 U.S. at 324, but it failed to do so. Accordingly, the Court grants summary judgment for BuzzBallz on Patco's UCL counterclaim to the extent it is premised on prosecution, procurement, and litigation involving the '904 Patent, "coordinated litigation," and sending cease-and-desist letters because this conduct is protected by *Noerr-Pennington* immunity.[8] *Realtek Semiconductor Corp. v. MediaTek, Inc.*, 732 F. Supp. 3d 1101, 1116 n.8 (N.D. Cal. 2024) (Conduct that is protected by *Noerr-Pennington* immunity "cannot be deemed a UCL violation" on the basis that it constitutes "an actual or incipient antitrust violation or violated the spirit of antitrust law.").[9]

---

[7] The sham exception and *Walker Process* fraud are similar but independent exceptions to *Noerr-Pennington* immunity. Patco did not reassert its *Walker Process* fraud counterclaim, but even if it had done so, the assertion that "BuzzBallz knew or should have known the '904 patent was invalid" does not create a triable issue. *See* Add. Fact No. 18. Patco was required to produce evidence that BuzzBallz "knowingly and willfully misrepresent[ed] facts to the Patent Office" – not merely that it made negligent misrepresentations or omissions. *Walker Process*, 382 U.S. at 177. The ambiguous assertion that BuzzBallz knew "or should have known" that its patent was invalid is insufficient as a matter of law. *See TransWeb, LLC v. 3M Innovative Props. Co.*, 812 F.3d 1295, 1306 (Fed. Cir. 2016) (requiring "knowing and willful fraud on the patent office"); *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1071 (Fed. Cir. 1998) (requiring "clear evidence of deceptive intent").

[8] Patco also initially claimed that BuzzBallz violated the UCL by asserting inconsistent trade dress definitions across different litigations. *See* Patco's Resps. to Fact Nos. 30, 40. However, "Patco does not oppose the Court granting BuzzBallz's motion in regard to allegations of unfair competition due to BuzzBallz's shifting trade dress definition." Opp. at 20. Summary judgment on this issue is also appropriate because Patco did not produce evidence that BuzzBallz's assertion of allegedly-shifting trade dress definitions was objectively baseless.

[9] Many courts have construed *Noerr-Pennington* immunity broadly, applying it to a variety of state law claims, including UCL claims. *See Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1007 (9th Cir. 2008) ("[B]ecause *Noerr-Pennington* protects federal constitutional rights, it applies in all contexts, even where a state law doctrine advances a similar goal."); *Kottle*

**3. Distribution and Retail Restrictions**

Next, Patco contends that BuzzBallz attempted to restrict Patco from accessing distributors and retailers. According to Patco, BuzzBallz attempted to pressure a few of its existing distributors not to carry Big Sipz, and it offered one distributor network the opportunity to do business with BuzzBallz if the distributor agreed not to carry Big Sipz in Oregon. *See* Add. Fact Nos. 13-18. BuzzBallz also allegedly pressured several retail stores not to carry Big Sipz. Opp. at 20. Patco does not argue that this conduct is fraudulent, and it failed to create a genuine dispute of material fact that the conduct is unlawful or unfair.

Patco has not shown that BuzzBallz's conduct is unlawful under the Sherman Act, Clayton Act, or any other antitrust law. BuzzBallz's conduct is most analogous to an exclusive dealing arrangement. "Exclusive dealing involves an agreement between a vendor and a buyer that prevents the buyer from purchasing a given good from any other vendor." *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996 (9th Cir. 2010). "The main antitrust objection to exclusive dealing is its tendency to 'foreclose' existing competitors or new entrants from competition in the covered portion of the relevant market during the term of the agreement." *Omega Env't, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997). Exclusive dealing arrangements may be anticompetitive "if they substantially foreclose competition, that is exclude competitors from so much of the market that they cannot gain a solid foothold to compete." *CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, 150 F.4th 1056, 1067 (9th Cir. 2025). To determine whether an exclusive dealing arrangement harms competition, courts consider a variety of factors aimed at understanding whether the arrangement impedes competitors from reaching consumers. For example, exclusive dealing arrangements imposed on distributors are

*v. Nw. Kidney Ctrs.*, 146 F.3d 1056, 1059 (9th Cir. 1998) ("[T]he *Noerr–Pennington* doctrine sweeps broadly and is implicated by both state and federal antitrust claims[.]"); *UCP Int'l Co. v. Balsam Brands Inc.*, 420 F. Supp. 3d 966, 980 n.11 (N.D. Cal. 2019) (recognizing that *Noerr-Pennington* immunity applies to UCL claims); *Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.*, Nos. C 04-2000 CW, C 06-2929 CW, 2007 WL 801886, at *4 (N.D. Cal. Mar. 14, 2007) ("While the *Noerr-Pennington* doctrine was formulated in the context of antitrust cases, it has been extended to cases involving other types of civil liability, including state law claims of unfair competition.").

"generally less cause for anticompetitive concern" if competitors can reach consumers through "alternative channels of distribution." *Omega Env't*, 127 F.3d at 1162-63. Exclusive dealing arrangements that are short term or easily terminable are less likely to harm competition. *Id.* at 1163; *see also Allied Orthopedic*, 592 F.3d at 997. Finally, direct evidence of healthy competition – including "increasing output, decreasing prices, and significantly fluctuating market shares among the major manufacturers" – is also relevant. *Omega Env't*, 127 F.3d at 1164-65.

To survive summary judgment on its theory that BuzzBallz's conduct was unlawful, Patco was required to show not only that it was harmed by the conduct, but also that market-wide competition was harmed or threatened. *See FTC v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020). From Patco's evidence, a reasonable jury could conclude that BuzzBallz hoped and even attempted to restrict Patco's sales. *See* Add. Fact Nos. 4, 13-17. But no reasonable jury could conclude that BuzzBallz actually succeeded in restricting Patco's growth, let alone that BuzzBallz substantially foreclosed market-wide competition.

With respect to distributors, Patco produced evidence that BuzzBallz tried to pressure RNDC, Southern Glazers, and Maletis not to carry Big Sipz cocktails, but there is no evidence that these attempts harmed Patco.[10] As to RNDC, BuzzBallz complained that it was "very concerned about [its] business moving forward with RNDC in [the Pacific Northwest]. Especially with the launch of Big Sipz[.]" Patco Ex. 14, ECF No. 322-12. RNDC responded: "I do not see Big Sipz in our system. When are they rolling out? We will NOT let them take any sales from Buzzballz." *Id.*; *see also* Add. Fact No. 13. However, there is no evidence in the record that RNDC actually declined to carry Big Sipz. To the contrary, BuzzBallz stopped using RNDC as a distributor for reasons unrelated to Big Sipz, thereby terminating any exclusive distribution arrangement that might have existed. *See* Kick Dep. Tr. 259:1-15. As to Southern Glazers, BuzzBallz allegedly "threatened to reevaluate its relationship . . . if Southern Glazers agreed to distribute Big Sipz," but Patco offers no evidence that this threat actually affected Big Sipz distribution. Patco Ex. 22, ECF

[10] BuzzBallz's founder explained: "We had to be choosey on who we went with, and I didn't want to be with a distributor that also was selling a competing brand that was trying to rip us off and look like us and share our space." Kick Dep. Tr. 258:14-23.

No. 269-21. Finally, Maletis – a distributor within the Anheuser-Busch distribution network – proposed to serve as BuzzBallz's sole or primary distributor in Oregon. BuzzBallz considered this proposal on the condition that Maletis and its sub-distributors would not distribute Big Sipz in Oregon. Add. Fact No. 14; *see also* Kick Dep. Tr. 260:9-261:10 (explaining that Maletis proposed to be BuzzBallz's distributor "for all of Oregon," but BuzzBallz would only agree if Maletis and its network of sub-distributors agreed not to carry Big Sipz).[11] But there is no evidence that this arrangement actually materialized. *See* Kick Dep. Tr. 259:16-261:10.[12]

Even if Patco's evidence tended to show that BuzzBallz entered into exclusive dealing arrangements with all of these distributors, there is no evidence that the arrangements impeded Patco or substantially foreclosed other competitors. To the contrary, Patco's own evidence demonstrates that it was able to enter and rapidly grow its Big Sipz sales. As of September 2025 – within three years of launching – Big Sipz cocktails were sold in every state except for Utah and Mississippi. Wheeler Dep. Tr. 176:25-177:6, ECF No. 321-23; *see also* BuzzBallz Ex. G-2, ECF No. 239-11 (reflecting that Big Sipz had launched in 40 states and the District of Columbia within the first two years, and experienced significant sales growth during that time). Patco claims that it achieved this success due to a "weakness" in BuzzBallz's distribution in a key sales channel, which Patco leveraged by engaging a distribution network with "broad penetration" of that channel. Harper Report ¶¶ 78, 87, 92-93 (opining that BuzzBallz's distributors were weak "where consumers were trending to shop"). Additionally, Patco did not identify any distributor that stopped carrying Big Sipz. Rohlich Dep. Tr. 156:1-4 ("Q. Since Big Sipz launched, are you aware of any distributor that . . . was carrying Big Sipz, but then dropped Big Sipz as a product? A. No,

---

[11] *See also* Patco Ex. 15, ECF No. 322-13 (Kick: "If they DROP selling Big Sipz FOR THE WHOLE STATE, and they can get every wholesaler to DROP BIG SIPZ, then I'll move. I'm not going to move for only Maletis dropping Big Sipz, it needs to be across the board. That was the deal I made them when they were here."); Patco Ex. 17, ECF No. 322-15 (Maletis and "the other Sub-distributors in the Northwest . . . [were] aligned on proceeding with moving things to full channel for [Oregon] with Maletis Beverage taking the lead. . . . [and] Bigfoot/Summit/Clatsop would not have Big Sipz in their portfolio if we proceed with the change.").

[12] Patco does not identify any other distributors that agreed to distribute BuzzBallz exclusively, but instead merely cites evidence of BuzzBallz's desire to enter into such agreements. *See* Patco Ex. 19, ECF No. 322-17 (listing Big Sipz as one of the "direct competitors that [BuzzBallz] want[ed] to prohibit for inbound distributors carrying and distributing").

I can't think of any offhand, no."). Patco's witness identified "a couple of distributors" that chose not to carry Big Sipz in the first place, but he could not recall why they made that decision. *Id.* 156:5-25. Given Patco's successful entry and expansion in the ready-to-drink category, and the evidence that other competitors enjoyed similar success, Harper Report ¶¶ 46, 320, it is undisputed that BuzzBallz did not substantially foreclose competition, *Omega Env't*, 127 F.3d at 1164-65.

With respect to retailers, Patco's evidence at most suggests that a few individual stores might have stopped carrying Big Sipz due to BuzzBallz's conduct. For example, Ernie's Liquors in Livermore, California, was displaying Big Sipz mixed in with BuzzBallz products as part of a BuzzBallz-branded cooler display. Patco Ex. 20, ECF No. 322-18. According to BuzzBallz's notes from a store visit, the store "agreed not to repurchase" Big Sipz. *Id.* Patco also asserts that Sazerac – which now owns BuzzBallz – threatened "to withhold its spirit offerings . . . if a retailer does not sell BuzzBallz, or if it sells Big Sipz."[13] Patco Ex. 22. In its interrogatory response,[14] Patco identified four individual stores where this conduct allegedly occurred: Hy-Vee, Inc., in Omaha, Nebraska; Mr. Butts Tobacco & Snacks, also in Omaha; Ranch Spirits in Costa Mesa, California; and House of Wine & Spirits in San Marcos, California. *Id.* Patco submitted its notes from retailer visits to corroborate these claims. *See* Patco Ex. 23, ECF No. 269-22. The document reflects that Mr. Butts Tobacco & Snacks in Omaha was not selling Big Sipz "because itll [sic] affect their Buzz sales and they were told by Sazerac (?) that they need to carry only Buzz in order to get any specialty/allocated liquor!" *Id.* at 1. By contrast, the notes reflect that Ranch Spirits in Costa Mesa *was* selling Big Sipz. *Id.* ("Is there Big Sipz execution in the store? YES."). Finally, the notes reflect that the Hy-Vee store was not selling Big Sipz, but there is no indication that this

[13] This could be evaluated as a tying arrangement – "that is, an arrangement in which the seller conditions the sale of one product (the tying product) on the buyer's purchase of a second product (the tied product)." *Teradata Corp. v. SAP SE*, 124 F.4th 555, 564 (9th Cir. 2024) (citation modified). However, this does not alter the analysis. Generally, tying arrangements still require foreclosure resulting in "substantial anticompetitive effects" to be actionable. *Id.* at 574; *see also id.* at 565, 572 (Even when a tie is evaluated as a *per se* antitrust violation, courts inquire into the market power of the defendant in the tying product market, and the arrangement must affect a "not insubstantial volume of commerce" in the tied product market.).

[14] BuzzBallz's objection to the interrogatory responses is overruled. *Uschold v. Carriage Servs., Inc.*, No. 17-cv-04424-JSW, 2020 WL 1466172, *3 (N.D. Cal. Mar. 6, 2020) (overruling objection to a party's reliance on its own interrogatory responses at summary judgment).

was due to BuzzBallz's conduct; moreover, the Hy-Vee buyer apparently "agreed to bring in 5-6 skus per store." *Id*. at 2.

Again, even if Patco's evidence established that BuzzBallz effectively shut Patco out of these individual stores, that does not create a genuine dispute of fact that Patco was excluded from the market, that its growth was impeded, or that competitors in general were substantially foreclosed. Even the "removal of one or more competing sellers" from a market does not necessarily establish harm to competition. *Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*, 884 F.2d 504, 508 (9th Cir. 1989). Although "injury to a market competitor" may establish "injury to competition . . . when the relevant market is both narrow and discrete and the market participants are few," *id.* at 508-09, that exception does not apply here given Patco's evidence that the ready-to-drink cocktail category was "high-growth" with "many new brands and products" entering. Harper Report ¶ 46.

In sum, because Patco failed to produce evidence that BuzzBallz's conduct violated antitrust law, the conduct was not unlawful within the meaning of the UCL. *See In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*, 28 F.4th 42, 54 n.7 (9th Cir. 2022); *see also Cel-Tech*, 20 Cal. 4th at 180.

For the same reasons, there is no triable issue on Patco's alternative theory that BuzzBallz's conduct was unfair under the UCL. Patco did not produce evidence suggesting that BuzzBallz's conduct "threatens an incipient violation" of an antitrust law, that the "effects are comparable to" a violation of antitrust law, or that competition was harmed or "significantly threaten[ed]." *Cel-Tech*, 20 Cal. 4th at 187; *see also Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1136-37 (9th Cir. 2014). To the contrary, the evidence summarized above establishes that BuzzBallz's conduct did not have any effect on competition in the market. Moreover, Patco produced no evidence suggesting that its potential *de minimis* loss of sales constitutes a threat to competition. "Only when the restraining force of an agreement or other arrangement affecting trade becomes unreasonably disruptive of market functions . . . is a violation of the Sherman Act threatened." *Les Shockley Racing*, 884 F.2d at 508; *see also Hip Hop Beverage Corp. v. Monster Energy Co.*, 733 F. App'x 380, 381 (9th Cir. 2018) (affirming dismissal of Sherman Act and Clayton Act

claims where "four brokers refused to do business" with the plaintiff, but plaintiff "did not allege how many total brokers were in the market in order to establish that [the defendant] foreclosed competition," and the plaintiff "remained in the market without the assistance of brokers"); *cf. Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1175 (9th Cir. 2016) ("[A]necdotal speculation and supposition are not a substitute for evidence, and that evidence decoupled from harm to competition – the bellwether of antitrust – is insufficient to defeat summary judgment.").

Certainly, BuzzBallz did not warmly greet Patco when it entered the market. But an unrealized desire to exclude one rival is not enough to sustain a UCL claim.[15]

## III. CONCLUSION

For the foregoing reasons, the Court GRANTS BuzzBallz's motion for summary judgment. Patco has failed to create a genuine dispute of material fact to sustain its cybersquatting counterclaim, and its UCL counterclaim is insufficient on every theory that Patco advanced. Therefore, Patco's remaining counterclaims are DISMISSED with prejudice in their entirety.

**IT IS SO ORDERED.**

Dated: September 24, 2026



Eumi K. Lee
United States District Judge

[15] Patco argues that it was "denied discovery" into whether distributors ceased doing business with Patco as a result of BuzzBallz's conduct, but it offers no basis for this assertion. *See* Patco Resp. to Fact No. 45. To the contrary, whenever Patco moved to compel discovery on distribution issues, Patco's requests were granted. *See* ECF No. 123 at 3 (seeking the Sazerac acquisition agreement in part because it may reflect "distributor arrangements"); ECF No. 142 (ordering production of that agreement); *see also* ECF No. 173-2 (seeking presentations to and communications with distributors); ECF No. 202 (confirming that responsive documents were produced after Patco's motion to compel was granted).